Staples, J.
The distinction between mistakes of law and of fact, as a foundation of equitable relief, is well established. This distinction is said to be one of expediency and policy, rather than of principle. Upon reasons of natural justice, the claim to such relief would seem to be as strong in the one case as in the other. The courts, however, proceed on the idea that, if parties were permitted to take advantage of mere mistakes of *321 law, the grossest fraud and injustice might he perpetrated, and, in the language of Lord Ellenborough, there is no saying to what extent the excuse of ignorance might not be carried. It is, therefore, an established rule of the courts that ignorance of the law will not affect the contracts of parties, or excuse from the legal consequences of their acts. It is not to be denied that in the English courts there has been some contrariety of decision on this subject, and the authority of great names is not wanting in support of various modifications of this rule. It will be found on examination, however, that these decisions are based on family agreements, or compromises of doubtful rights, or on cases in which no other rights have intervened, and the parties can be reinstated, or of surprise, imbecility, or fraud and undue influence. Wherever the question has turned upon a puré mistake of law, without the admixture of other elements, it is believed that few cases can be found, even in the English courts, in which relief has been afforded. This holds true more particularly where the party against whom the interposition of the court is invoked occupies the position of a bona fide purchaser for valuable consideration. In Bowen v. Evan, 1 I. & L., 264, Chancellor Sugden said that, in his opinion, whether the purchaser has the legal or only an equitable interest, he may, by way of defence, avail himself of the character of a purchaser without notice, and is entitled to have the bill dismissed, though the next hour he may be turned out of possession by the legal title. Whatever may be the modifications of this rule, as laid down by Chancellor Sugden, in cases of mere equitable interests, it is clear that, when the purchaser is clothed with the legal title, he is beyond the reach of a court of equity; and this upon the principle that where there is equal equity the law shall prevail. As the defendant has equal claim to the protection of the court for his title as the plaintiff has to maintain his, the court declines to *322 interfere in behalf of either party. And, so far is this principle carried, that, if the purchase is originally • of an equitable title without notice, and the party after-wards purchases with notice, the legal title to support his equitable right, he will be protected. In Culpeper’s case, cited in 2d Leading Equity Cases, 52, where a person had bought gavelkind land of the eldest son, and paid his purchase money without knowledge that it was gavelkind, and afterwards, for a song, bought in the titles of the younger brothers, who were ignorant of their titles, it was yet held they could not afterwards be relieved in equity: for it was said that the purchaser having honestly paid his money without notice, might use what means he could to fortify his title. Lord Hardwicke fully recognized the'same principle in Malden & wife v. Merrill & als., 2 Atk. R. 8, in deciding that a purchaser having given full value for au estate, the mistake or ignorance of some of the parties 'to a conveyance, of their claim under a marriage settlement, should not operate to the prejudice of such purchaser. Teasdale v. Teasdale, Sel. Ch. Cases, 59, 170; and Sturge v. Starr, 2 Mylne & Keene R. 195, 7 Eng. Ch. R. 195, sustain the same doctrine. These authorities abuudantly establish, that under the rule of the English courts, the aid of a court of equity cannot be successfully invoked against a purchaser for valuable consideration without notice, upon the ground of ignorance of title originating in a mere mistake of law.
In the States, according to Mr. Justice Story, the general rule that mistake of law cannot affect the contracts of parties, has been recognized as founded in sound wisdom and policy, and proper to be upheld with a steady confidence ; and hitherto the exceptions to it will be found not to rest upon the mere foundation of a naked mistake of the law, however plain and settled the principle may be, nor upon any ignorance of title founded upon such mistake. He further declares the present disposi *323 tion of courts of equity is to uarrow rather than enlarge the exceptions. Chancellor Kent has repeatedly given his sanction to the same doctrine. In Lynn v. Richmond, 2 John, Ch. R. 60, he said the courts do not undertake to relieve parties from their acts and deeds fairly done, though under a mistake of law. Every man is to be charged at his peril with a knowledge of the law. There is no. other principle which is safe and practicable in the common intercourse of mankind. In Crosier v. Acer, 7 Paige R. 137 and 143, Chancellor Walworth announced the same views in language equally emphatic and unmistakable.
When the case of Hunt v. Rousmanier, reported in 8 Wheaton, 174, was for the first time before the Supreme court of the United States, that court then said : “ Although we do not find the naked principle that relief may bo granted on account of ignorance of the law, asserted in the books, we find no case in which it has been decided that a plain and acknowledged mistake is beyond the reach of equity.” But when the case was before the court a secoud time, 1 Peters. U. S. R. 1, Mr. Justice Washington, speaking for the court, said, “We hold the general rule to be that mistake arising from ignorance of the law is not a ground for reforming a deed founded on such mistake. And whatever exceptions there may be to this rule, they will be found to be few in number, and to have something peculiar in their character, and to invoke other elements of decision. In the Bank of the United States v. Daniel, 12 Peters. U. S. R. 32, these principles were fully sustained.
It is not necessary, however, to rely alone upon the decisions of foreign courts. In Brown v. Armistead, 6 Rand. 594, this court announced the doctrines held by the Supreme court of the United States. Judge Carr, after exhibiting in the clearest light the dangers of a contrary rule, said, “ Mistake of fact where it is plain, palpable,' and affects the very substance of the subject matter of *324 the contract, is sometimes a ground of rescission, but a simple mistake of law never. There are some of the elder eases, certainly, which have given relief in a few instances of very gross mistake of law, but the great weight of authority, indeed I believe I might say all the late cases, are to the contrary.”
I think, therefore, it may be safely assumed as a; well established rule of the courts, that ignorance of the law with full knowledge of the facts, furnishes no ground to set aside the solemn contract.of parties. I do not mean to assert the rule as absolute and inflexible in all cases, but in the language of Judge Story, it may be affirmed that the real exceptions to it are very few, and generally stand upon some very urgent pressure of circumstances.
The case of Irick and wife v. Fulton’s exor’s, 3 Gratt. 193, has been relied on as furnishing a eontr ry rule. A slight examination will show that this is a total misconception. Irick and wife sold aud conveyed their interest in a tract of land to Fulton, both parties supposing that Mrs. Irick was entitled only to one undivided interest therein. It ivas afterwards ascertained that Mrs. Irick was the owner of the entire tract. This court set aside the sale and conveyance upon the ground that the parties only sold and purchased, and only intended to sell and purchase, such undivided interest. The vendee supposed he was merely purchasing a part, and in point of fact only paid for such part. It would therefore have been grossly unjust to permit him to retain the whole. In this case the entire tract was sold, the purchaser believed he was buying and actually paid for the whole.
Strong reliance has also been placed upon the case, of Lammot v. Bowly, 6 Harris & John. R. 500, decided by the Supreme court of Maryland. The court says “the question presented for the decision of this court, is simply this, whether a man having a legal title to a parcel of laud, but who is ignorant ot his right, forfeits his title *325 to the land by concealing his right when he knows that another is about to purchase it from a third person, and so the court hold that he is not estopped to assert his title.” It must be borne in mind, in that case no conveyance of the legal title was executed by the owner ; nor does it appear that he encouraged the sale. How, I takea't, there is a wide distinction between mere silence or acquiescence on the part of the owner, and an active participation in an arrangement for the sale of his property to a third person. In the former case all the authorities show that the true owner must at the time be acquainted with his rights, and must have wilfully and culpably concealed them. It is impossible to say that a man is guilty of a fraud in withholding information of his title when he is ignorant of its existence ; and as he is still clothed with the legal title, equity will not interpose to divest him of it. But when the owner encourages the sale, when he concurs in it by participating in it, it becomes his own act, and he will not be permitted to allege that he was under a misapprehension of his rights as to their extent or nature in point of law. Procter v. Keeth, 12 B. Mon. R. 256, and other cases cited in Second Leading Cases in Equity. This is the doctrine of equitable estoppel recognized by the uniform current of authorities. If, however, the owner not only concurs in the sale and encourages the purchase, but also unites in a conveyance of the legal title, he must encounter at the threshold of his application for relief, not only the equity but the legal title of the purchaser. In such case, the purchaser has not only a superior equity, but the law on his side. It is difficult to perceive any ground which would warrant the interposition of a court of chancery against him.
Apply these principles to the case under consideration. Let us suppose no application had been made to the court to sell the laud, but that one of the heirs had gone to Zollman, proposing to sell the entire tract, representing *326 that Mrs. Moore was the owner of one moiety, and the heirs, the other, and that she was willing to unite with -them1 in a deed conveying the property; and Mrs Moore being called on,'had expressed her approval of this arrangement, and had actually united in the deed, which was accepted by the vendee, and the purchase money thereupon paid; will it be maintained that Mrs. Moore could be afterwards heard to say she was mistaken as to her rights, that she was owner of the entire tract, and that the sale should be set aside because an error was committed in paying one-lialf the principal money to the heirs, instead of the whole amount to herself. It would be an unprofitable consumption of time to discuss such a proposition. What is the difference between representations of this kind directly made to the purchaser, and such as are made through the medium of a court of justice ? May not the purchaser rely upon them as implicitly in the one case as in the other ? Having the sanction óf a judicial sentence, they are better calculated to create confidence than when privately made in the country. The original bill upon which the decree of sale was obtained, was filed in the name of Mrs. Moore in conjunction with her children. It professed to be her bill, as well as theirs. It represents that she is the owner of one-half the tract, and her children the owners of the other half; that it would be better for the infant heirs that the tract should be sold, and their share of the proceeds invested; and the court was asked to render a decree for such sale. The prayer of the bill was granted, and the sale made. Was the purchaser to discredit these statements ? Was he to be wiser than the court and the parties ? When they stated they were joint-owners of the tract, was it incumbent upon him to makfe investigations of title, employ counsel, and search records to ascertain whether perchance one of the plaintiffs was not the owner in severalty of the entire tract % Suppose he had examined the deed, as is insisted, it would not *327 follow that ho understood the law better than Mrs. Moore and her advisers. He might well say I was equally ignorant as herself and friends of the decision of ■ the Supreme court under which she was entitled to the whole tract. Let it be conceded he was correctly advised as to her rights in the premises. I will venture to assert, that counsel would have advised him, that as Mrs. Moore herself had asked for the sale, and the court had decreed it, he might purchase with absolute safety.
It is true that in Virginia the maxim caveat emptor strongly applies, in judicial sales ; but it only applies as between the purchaser and third persons who are not parties to the suit. Their interests are not affected by any proceedings that may be had, and the purchaser must always incur the risk of losing the estate by some superior title. But the court does undertake to sell the title of the parties to the suit. Whatever that may be, the purchaser acquires it. He must take care that the sale is made in accordance with the decree ; but he is not bound to see to the proper application of the purchase money; nor is he responsible for any error the court may commit in any of the subsequent proceedings. These are matters over which he has no control, and as to which he cannot be heard. He has the right to suppose that the court, under whose sanction the sale is made, will distribute the funds according to the respective interests of those entitled; and if an error is committed in this respect the - remedy is not against him ; but by an appeal to a higher court to correct the distribution. Previous to the decree of confirmation the purchaser has only an inchoate contract with the court ; but after the confirmation, the purchase money paid and the deed executed, he has a complete and perfect contract, which can only be set aside upon grounds which, would vacate any other executed contract. Let it once be established that j udicial sales may be annulled at any length of time for errors or mistakes not disclosed by *328 the record, and the laws authorizing such sales will become a dead letter upon the statute book. Who • would venture to purchase under such circumstances, except at ruinous losses to the owner, or to improve property so acquired % Who would incur the hazard of buying from a purchaser at such sale : for, if the original purchaser is not protected, neither is his vendee. Under the rule asserted, into whatever hands the property may pass, it is still subject to the equity of the original owner. It is no doubt true that Mrs. Moore would never have brought the suit, or permitted it, had she known she was the owner of the estate. In such case there would have been no necessity, and, indeed, no ground for an application to the court. But the suit being brought, and a sale decreed, the essential error was in the decree directing a distribution of the proceeds of sale; an error which might have been corrected, and the mischief in some degree remedied, by the exercise of reasonable diligence on the part of'Mrs. Moore in a better investigation of her title. Whatever may have been the haste exhibited in obtaining the decree of sale, (and with that the purchaser has no concern,) the purchase money was not paid until more than six months had elapsed; and within that period the mistake might have been discovered and corrected ; probably even against the purchaser.
It is not to be denied that the greatest injustice was done Mrs. Moore in allowing her only the value of a dower interest in the proceeds of sale. Whether this was the result of inadvertence, or an entire misconception of her legal rights, we have no means of ascertaining. That, however, is a matter between her and her children, with which Zollman has no concern. It cannot possibly affect the decree, or the sale made under it.
It was argued, however, that as the suit proceeded on the assumption of a right of property in the children, the effect of the decree and sale is simply to vest in the *329 purchaser such title as they had, leaving the rights of Mrs. Moore unaffected. This view is based on an entire misconception of the effect of the sale, its confirmation, ' and the operation of the deed made under the order of the court. The prayer of the bill was for a sale of the tract of land ; the decree directed a sale accordingly; the commissioner reported that he had sold the tract; and this sale was confirmed, and the commissioner directed to convey the tract to the purchaser ; and this was done by the deed executed 4th January 1864. It is therefore too clear for argument, that the effect of these proceedings was to • convey the land to the purchaser, and to clothe him with the title of all the parties to the-suit. If this were not so, it is obvious that Mrs. Moore-would not encounter the slightest difficulty in maintaining her action of ejectment against the purchaser, and consequently she could have no claim to relief in equity.
It is not pretended that Zollman was guilty of any fraud, misrepresentation or other unfair conduct, or that he was apprised of the mistake or delusion under which Mrs. Moore was acting with regard to her title. He therefore occupies the impregnable position of a purchaser for a valuable consideration without notice. How is it possible for a court of equity, consistent with well established principles, to disarm him, to deprive him of an advantage honestly and fairly obtained. In this-respect Zollman occupied a much higher ground than that of the purchaser in Storrs v. Barker, 6 John. Ch. R. 169. There a feme covert seized of land, devised it to her husband, and died leaving her father as- heir at law ; and the husband, as devisee, took possession of’ the land, and continued to occupy and improve it; and afterwards sold the land for a valuable consideration, by the advice of the father, who disavowed any claim to the-land as heir to his daughter. The father having brought his ejectment, upon a bill by the purchaser to stay the action, Chancellor Kent, after an elaborate review of all *330 the authorities, held that the declaration of the father of his ignorance of the invalidity in law of his daughter’s if well founded in point of fact, was no sufficient defence against the equitable bar to his legal title arising from his acts and admissions; inasmuch as with knowledge of all the facts, he was bound to inform himself of his own title before he undertook to advise and encourage the sale and purchase of the same land by others ; and he accordingly perpetually enjoined the defendant from prosecuting his action at law. It seems to me that these views and the authorities cited effectually dispose of this branch of the case.
It only remains to notice two other grounds taken in the argument. It is insisted that Zollman was not a purchaser for valuable consideration ; that the fourteen thousand dollars in treasury notes, paid by him, were at the time of the sale of the value of two thousand dollars only in gold, and at the period of payment, of the value only of eight hundred and seventy-six dollars in gold ; while the assessed value of the land was over six thousand dollars. There is nothing in the record to impugn the fairness of the sale ; it was publicly made; it was conducted by the son-in-law of Mrs. Moore, who had the strongest motives to obtain the highest price, and a number of substantial citizens of the county were present actively bidding for the property. Eo complaint was made, no intimation ever given that the land did not command a fair price in the then existing currency. And now, after the lapse of three years, this court is asked to reduce the nominal amount of the purchase money to its gold value, and by that standard to declare the price inadequate. It is unnecessary to repeat what has been so often said, that real estate after the year 1861 did not command in Confederate currency its estimated value before the] war, nor is it necessary to •assign the reasons for this condition of things. If this ¡sale can be set aside for inadequacy of consideration, *331 there is scarcely a contract for the sale of real estate made during the existence of the struggle, which may not be vacated on the same grounds. Besides all this, it is too late to make such an objection after the confirmation of the sale.
Another' position taken is that the decree did not authorize a sale for Confederate currency. A simple statement of the facts is a sufficient answer to this proposition. The suit was brought in 1863, when Confederate money was exclusively in circulation ; the bill, in asking for a sale, also asked that the proceeds should be paid to the complainants, and invested for the benefit of the infants according to their respective interests. The bonds were payable in Confederate currency, in instalments of six, twelve and eighteen months ; with the privilege to the purchaser, of discharging them before maturity; they were returned by the commissioner and filed with his report, and the sale confirmed without objection. Mrs. Moore at the time resided with her son-in-law, who acted in the double capacity of receiver and commissioner. She was one of the sureties in the bond executed by him as receiver, by which he was authorized to withdraw the bonds and collect the purchase money. The proceeds of sale were collected in November 1863, and immediately distributed among those entitled; Mrs. Moore receiving the amount of her supposed interest. It is impossible, in view of all these circumstances, to suppose that either of the parties regarded the decree as requiring a sale for coin or United States currency. Such a sale would have resulted in a.ruinous sacrifice of the property. And if the decree had required it, it is now too late to insist upon it, as no such objection was made either before or after the confirmation ; nor before or after the payment of the purchase money, and its distribution among the parties before the court. It has been suggested that complete justice might be done in this case by returning to the purchaser the value of the *332 Treasury notes advanced by him. And I was at one time inclined to the opinion that possibly Mrs. Moore might be relieved by an arrangement of that sort. But a little reflection has satisfied me that this is not only impracticable but unjust. In the first place, this court cannot say that the specie value of the currency was a fair equivalent for that currency, or a just compensation for the land. ¥e know neither the source from which Zollman derived his money, nor the sacrifices he made to obtain it; nor the uses to which he might have devoted it but for this purchase. He might, and doubtless would, have invested it in the purchase of other real estate upon terms equally beneficial to himself. Courts of equity decree specific performance even where the price is grossly inadequate, if the purchaser is in no default. Certainly they do not undertake to set aside the contracts of parties except under very peculiar and extraordinary circumstances. Nothing of the kind is shown here to justify the interference of a court of equity. But a more serious difficulty in the way is that Zollman is not seeking the assistance of this court for any purpose. He stands upon his legal and equitable rights. As he asks nothing, no terms can be imposed on him. He is simply beyond the reach of a court of equity.
I have thus attempted to notice the principal points presented in the argument. I have done so because the peculiar hardship of this case has been strongly pressed upon us. The case is a very hard one, I am free to admit: hard that this poor widow should be stripped in her old age of the little estate derived from the bounty of her friends. But the struggle through which we have passed is a history of afflicting calamities ; a vast maelstrom in which were engulphed the fortunes of countless human beings. It has been the misfortune of the present court to be compelled to apply tbe severe rules of law to many cases which might well excite tho commiseration of the hardest hearts. ¥e are required, *333 however, to act upon fixed principles. We have no power of superseding or modifying the law, or of enforcing the charities flowing from natural equity and justice. It is better there should be individual instances of suffering and loss, than that established principles should be violated, and chaos and confusion produced in the administration of justice. These views render it unnecessary to consider the other questions so elaborately discussed by counsel.
For the reasons stated, I am of opinion the decree of the Circuit court should be reversed, and the bill dismissed as to the appellant Zollman.
The other judges concurred in the opinion of Staples, J.
The decree was as follows:
The court is of opinion, for reasons stated in writing, and filed with the record, that the said decree is erroneous : Therefore, it is decreed and ordered, that the same be reversed and annulled ; and that the appellee, Mary L. Moore, pay to the appellant his costs by him expended in the prosecution of his appeal aforesaid here; and this court, proceeding to pronounce such decree as the said Circuit court ought to have pronounced, it is further decreed and ordered, that the bill of review and supplemental bill of the said appellee be dismissed, and that she pay to the appellant his costs by him about his defence in the said Circuit court expended; which is ordered to be certified to the said Circuit court of Rockbridge county.
Decree reversed.